# Exhibit 1

.

## ASSET PURCHASE AND SALE AGREEMENT

This ASSET PURCHASE AND SALE AGREEMENT, effective the 1st day of December, 2014, (hereinafter referred to as the "Agreement"), is entered into by and among SIMPLICITY GOURMET INTERNATIONAL, INC., a Tennessee corporation with a principal place of business at 750 Jim Parker Drive, Suite 200, Smyrna, TN 37167 (hereinafter referred to as "Seller") and NUTRICHEF USA, INC., a Florida corporation with a principal place of business at 4020 South 57th Avenue, Suite 204, Lake Worth, FL 33463 (hereinafter referred to as "Buyer"), and ARNOLD JOHNSON (hereinafter referred to as "Guarantor").

WHEREAS, Seller is in the business of direct marketing to consumers for products such as cookware, bakeware and cutlery; and

WHEREAS, Buyer is also in the business of direct marketing to consumers for products such as cookware, bakeware and cutlery; and

WHEREAS, Sellers wishes to sell to Buyer, and Buyer wishes to buy from Seller, certain consumer lead information, equipment and goodwill belonging to Seller pursuant to and subject to the terms and conditions set forth herein

NOW, THEREFORE, in consideration of the mutual promises herein made and the mutual benefits to be derived from this Agreement, the parties hereto do agree as follows:

### SECTION 1

### TRANSFER OF SELLER ASSETS

1.1  Definition of Seller Assets.  The phrase "Seller Assets" as used in this Agreement shall be deemed to mean the consumer lead information more specifically identified and detailed in Exhibit A hereto, the equipment more specifically identified and detailed in Exhibit B hereto, and Seller's goodwill, but does not include any liabilities of Seller as of December 1, 2014.

1.2 Excluded Assets. The only assets owned by Seller to be sold hereunder are those set forth in Subsection 1.1 of this Agreement. All other assets owned by Seller are therefore excluded from the sale hereunder.

1.3 Transfer of Assets. Subject to the terms and conditions hereof, and upon the representations and warranties herein made by Buyer and Guarantor to Seller, Seller will sell, transfer, assign, convey and deliver to Buyer on the Closing Date (as hereinafter defined) the Seller Assets.

## SECTION 2

## PURCHASE PRICE

2.1 Purchase Price. Buyer and Guarantor shall pay to Seller in exchange for the Seller Assets a total of six hundred thousand dollars ($600,000) plus interest on any outstanding balance remaining due after the Closing Date at the annual percentage rate of six percent (6%).

2.2 Manner of Payment. Buyer shall make payment of the total purchase price for the Seller Assets in the following manner:

a. Down Payment. Buyer and Guarantor shall pay to Seller on the Closing Date one hundred fifty thousand dollars ($150,000).

b. Promissory Note. Buyer and Guarantor shall execute the Promissory Note attached hereto as Exhibit C and pursuant thereto pay to Equitable Acceptance Corporation ("EAC") the remaining four hundred fifty thousand dollars ($450,000), plus interest at six percent (6%) APR.

c. Monthly Payments to EAC. The first monthly payment hereunder is due from Buyer and Guarantor to EAC on or before February 15, 2015. The monthly payment shall be equal to seventy five percent (75%) of the rebate Buyer earns by purchasing products from New Era, Inc. in the month preceding the monthly payment date, but in no event shall be less than six thousand dollars ($6,000) per month. Buyer and Guarantor hereby expressly instruct New Era, Inc. to pay monthly to EAC seventy five percent (75%) of the rebate Buyer earns by purchasing products from New Era, Inc. in the month preceding the monthly payment date.

c. Security. As security for the payment of the purchase price as evidenced by this Agreement and the Promissory Note referred to above, Guarantor shall

execute a Guaranty in the form attached hereto as Exhibit D, which shall be executed on the day of closing and delivered to Seller and/or EAC at the time of closing.

2.3  Allocation of Purchase Price.  The total purchase price shall be allocated among the Seller Assets as follows:



| | | |
|---|---|---|
| a. Consumer Leads | $ 338,147.00 ) | |
| b. Equipment | $ 125,000.00 | |
| c. Goodwill | $ 136,853.00 | |

Each party hereto agrees and covenants that it will report the transaction for income tax purposes in accordance with this Section 2.3 and will not take a position inconsistent therewith.  Each party shall complete IRS Form 8594, or the subsequent equivalent, and shall file a copy of same with their income tax return.  The parties hereto agree that the purchase price paid for the Seller Assets was determined in good faith and at arms-length.

2.4  Non-Assumption of Liabilities.  Neither Buyer nor Guarantor shall assume or be responsible for any wages, taxes, FICA, insurance and fringe benefits due to or on behalf of Seller's agents, representatives, independent contractors and/or employees before and including the Closing Date; any accounts payable, taxes and insurance, rent and other liabilities incurred by the Seller before and including the Closing Date; and Seller shall indemnify and hold Buyer and Guarantor harmless against all such accounts payable and other liabilities.  In no event will Buyer and/or Guarantor assume any other liabilities of Seller except as set forth in this Agreement.

2.5  Prepayment.  Buyer and Guarantor may prepay their obligations hereunder in full at any time, free from penalty.

2.6  New Era, Inc. Agreement.  As and for additional consideration, Buyer and Guarantor will execute and abide by the agreement attached hereto as Exhibit E.

## SECTION 3

## REPRESENTATIONS AND WARRANTIES OF SELLER

As a material inducement to Buyer and Guarantor to enter into this Agreement and to consummate the purchase and sale contemplated hereunder, Seller represents, warrants and agrees as follows:

3.1 Organization and Standing. Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Tennessee and has all requisite corporate power and authority to own its property and to carry on its business as it is now being conducted.

3.2 Transfer of Property. Seller has, and on the Closing Date Seller will have, and will convey to Buyer using the Bill of Sale attached hereto as Exhibit F, the Seller Assets, free and clear of all mortgages, liens, pledges, charges or encumbrances of any nature whatsoever.

3.3 Corporate Authorization. The execution, delivery and performance of this Agreement by Seller have been duly authorized by proper corporate action and are within its corporate powers. This Agreement constitutes a legal, valid and binding obligation of Seller and is enforceable against Seller in accordance with its terms.

3.4 Operation of Seller's Business. As of the date of this Agreement, Seller has not (a) sold, transferred or otherwise disposed of any of the Seller Assets, other than in the ordinary course of business; (b) suffered any damage, destruction or loss, whether or not covered by insurance, materially and adversely affecting the Seller Assets; (c) suffered or experienced any material decline in sales or profitability not otherwise known to Buyer and/or Guarantor; (d) entered into any transaction not in the ordinary course of business; or (e) become aware of any customer or supplier who will not continue to do business with Seller as a result of this transaction.

3.5 No Breaches, etc. The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby do not and will not result in any breach of any of the terms or conditions of any mortgage, bond, indenture, agreement, contract, license or other instrument or obligation to which Seller is a party or by which the Seller Assets

are bound, nor will they violate any statute, regulation, judgment, writ, injunction or decree of any court, threatened or entered into any proceeding or action in which Seller is, was or may be bound or to which any of the assets is subject.

3.6  Lawsuits, Proceedings, etc.  On the date hereof, Seller is not engaged in any legal action or other proceedings before any Court or administrative agency which would or might prohibit the transaction contemplated hereby or which would or might adversely affect the Seller Assets or the business currently being conducted by Seller.  No facts or circumstances exist that might give rise to any action or proceeding that would adversely affect the Seller Assets or such business.

3.7  Representation and Warranties.  The representations and warranties contained in Sections 3.1 through Section 3.6 of this Agreement shall be true on and as of the Closing Date with the same force and effect as though such representations and warranties had been made on and as of the Closing Date.  Such representations and warranties have been made by Seller with the knowledge and expectation that Buyer and Guarantor are relying thereon, and such representations, warranties and covenants shall survive the Closing Date and shall remain operative in full force and effect indefinitely regardless of any investigation at any time made by or on behalf of Buyer and/or Guarantor, and shall not be deemed merged in any document or instrument so executed and/or delivered by Seller.

3.8  Exclusion.  Seller makes no representations, assurances or warranties regarding the viability of any of the consumer lead information transferred hereby.

SECTION 4

REPRESENTATIONS AND WARRANTIES BY BUYER AND GUARANTOR

As a material inducement to Seller to enter into this Agreement and to consummate the purchase and sale contemplated hereunder, Buyer and Guarantor represent and warrant as follows:

4.1  Valid and Binding Agreement.  This Agreement and the transactions contemplated hereby are valid and binding obligations of Buyer and Guarantor.

4.2 <u>Organization and Standing</u>.  Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of Florida, and has all requisite corporate power and authority to enter into this Agreement and to consummate the transactions contemplated by this Agreement.

4.3 <u>Corporate Authorization</u>.  The execution, delivery and performance of this Agreement by Buyer have been duly authorized by proper corporate action of Buyer and are within its corporate powers.  This Agreement and the documents to be delivered by Buyer pursuant to Section 7.3 constitute the legal, valid and binding obligation of Buyer and are enforceable against Buyer in accordance with their terms.

4.4 <u>No Breaches, etc</u>.  The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby do not and will not result in any breach of any of the terms or conditions of any mortgage, bond, indenture, agreement, contract, license or other instrument or obligation to which Buyer and/or Guarantor is a party, nor will they violate any statute, regulation, judgment, writ, injunction or decree of any court, threatened or entered into any proceeding or action in which Buyer and/or Guarantor is, was or may be bound.

4.5 <u>Lawsuits, Proceedings, etc</u>.  On the date hereof, Buyer and/or Guarantor is not engaged in any legal action or other proceedings before any Court or administrative agency which would or might prohibit the transaction contemplated hereby.  No facts or circumstances exist that might give rise to any action or proceeding that would adversely affect this transaction.

4.6 <u>Representation and Warranties</u>.  The representations and warranties contained in Sections 4.1 through Section 4.5 of this Agreement shall be true on and as of the Closing Date with the same force and effect as though such representations and warranties had been made on and as of the Closing Date.  Such representations and warranties have been made by Buyer and Guarantor with the knowledge and expectation that Seller is relying thereon, and such representations, warranties and covenants shall survive the Closing Date and shall remain operative in full force and effect indefinitely regardless of any investigation at any time made by

or on behalf of Seller, and shall not be deemed merged in any document or instrument so executed and/or delivered by Buyer and/or Guarantor.

SECTION 5

CONDUCTION OF BUSINESS PENDING THE CLOSING DATE

For the period commencing as of the date hereof, until the Closing Date (hereinafter referred to as the **"Interim Period"**), with respect to the Seller Assets:

5.1 <u>Full Access</u>. Subject to the provisions of Section 5.2 below, Seller shall furnish or cause to be furnished to Buyer and Guarantor all information with respect to the Seller Assets as Buyer and Guarantor may reasonably request.

5.2 <u>Confidentiality</u>. If the sale and purchase of the Seller Assets as herein contemplated is not consummated, for whatever reason, Buyer and Guarantor agree that all information concerning Seller's business shall be kept confidential and not used in any form or manner by Buyer and/or Guarantor.

5.3 <u>Business in the Ordinary Course</u>. During the Interim Period, Seller shall cause the business currently conducted by Seller to be carried on diligently and substantially in the same manner as Seller's business has heretofore been conducted.

5.4 <u>Compliance with Laws</u>. Seller will duly comply with all applicable laws as may be required for the valid and effective transfer of the Seller Assets as contemplated by this Agreement.

5.5 <u>Costs</u>. Seller and Buyer shall each bear the costs and expenses of their own legal counsel, accountants and other agents and personnel with respect to all aspects of the transaction recited in this Agreement.

## SECTION 6

## CONDITIONS PRECEDENT TO BUYER'S AND GUARANTOR'S OBLIGATIONS

Each and every obligation of Buyer and/or Guarantor to be performed on the Closing Date or thereafter, as the case may be, shall be subject to the satisfaction prior thereto of the following conditions:

6.1  No Adverse Change.  Neither the Seller Assets nor the business, financial affairs or prospects for business of Seller shall, compared to the twelve (12) months preceding the Closing Date, have been materially adversely affected in any way; provided, however, any material adverse effects are not the result of Buyer and/or Guarantor's actions or inactions.

6.2  Compliance with Agreement.  Seller shall have performed and complied in all material respects with all of the obligations under this Agreement which are to be performed or complied with by it prior to or at the Closing Date.

6.3  Proceedings and Instruments Satisfactory.  All proceedings to be taken by Seller or on behalf of Seller in connection with the transaction contemplated by this Agreement, and all documents incident thereto, shall be satisfactory in form and substance to Buyer and Guarantor.

6.4  All Documents.  All documents required by this Agreement shall have been delivered to Buyer and Guarantor.


## SECTION 7

## CLOSING

7.1  Closing.  Closing with respect to the transactions contemplated hereunder shall take place at such location as is mutually acceptable to the parties.  The date and time of the Closing shall be on or before 5:00 P.M. (Central) on December 1, 2014.

7.2  Seller's Obligations.  At the closing, Seller shall deliver to Buyer and Guarantor such documents, instruments and certificates not inconsistent with the provisions of this Agreement, including but not limited to Exhibit F attached hereto, executed by Seller, as Buyer and

Guarantor shall reasonably require to carry out and effectuate the purposes and terms of this Agreement.

7.3  <u>Buyer's and Guarantor's Obligations</u>.  At the closing Buyer and Guarantor shall deliver to Seller the following fully executed documents:

i.  A lawfully executed Promissory Note in the form attached hereto as Exhibit C;

ii.  A lawfully executed Guaranty in the form attached hereto as Exhibit D;

iii.  A lawfully executed agreement attached hereto as Exhibit E;

iv.  A lawfully executed copy of this Asset Purchase and Sale Agreement; and

v.  Any other and further documents Seller shall reasonably require to carry out and effectuate the purposes and terms of this Agreement

## SECTION 8

## INDEMNIFICATION

8.1  <u>Indemnification by Seller</u>.  Seller shall defend, indemnify and hold Buyer and Guarantor harmless at all times after the date of this Agreement against and in respect of any and all of the following:

a.  Any and all liabilities and obligations of, or claims against, Buyer and Guarantor with respect to the Seller Assets which arose out of or in connection with actions or events occurring before the Closing Date, other than as expressly assumed by Buyer under the provisions of this Agreement;

b.  Any and all damage or deficiency resulting from any misrepresentation, breach of warranty, or nonfulfillment of any obligation on the part of Seller under this Agreement or any schedule to this Agreement or from any misrepresentation in or omission from any certificate or other instrument furnished to Buyer and Guarantor hereunder; and

c.  All demands, assessments, judgments, costs and legal and other expenses arising from or in connection with any action, suit, proceeding or claim incident to any of the foregoing.

8.2   Indemnification by Buyer and Guarantor.   Buyer and Guarantor shall defend, indemnify and hold harmless Seller at all times after the Closing Date against and in respect to any and all of the following:

a.   Any and all liabilities and obligations of, or claims against, Seller resulting from any breach of Buyer's and/or Guarantor's covenants contained in this Agreement;

b.   Any and all damage or deficiency resulting from any misrepresentation, breach of warranty, or nonfulfillment of any obligation on the part of Buyer and/or Guarantor under this Agreement or any schedule to this Agreement or from any misrepresentation in or omission from any certificate or other instrument furnished to Seller hereunder;

c.   Any and all liabilities and obligations of, or claims against Seller with respect to the Seller Assets sold hereunder which arose out of or in connection with actions or events occurring on or after the Closing Date; and

d.   All demands, assessments, judgments, costs and reasonable legal and other expenses arising from or in connection with any action, suit, proceeding or claim incident to any of the foregoing.

## SECTION 9

### INTENTIONALLY LEFT BLANK

## SECTION 10

### OTHER PROVISIONS

10.1   Nature and Survival of Representations.   All statements contained in any certificate, instrument or document delivered by or on behalf of any of the parties pursuant to this Agreement and the transactions contemplated thereby shall be deemed representations and warranties by the respective parties hereunder.   All representations and warranties made by the parties, each to the other, in this Agreement or pursuant hereto, shall survive, except to the extent waived in writing by either of them, the consummation of the transaction contemplated by this Agreement, notwithstanding any investigation heretofore or hereafter made by either of them or

on behalf of either of them.  Each Exhibit hereto shall be deemed to include and refer to every other Exhibit hereto.

10.2  Parties in Interest.  All the terms and provisions of this Agreement shall be binding upon and inure to the benefit of and be enforceable by the successors in interest of the respective parties hereto.

10.3  Law Governing.  This Agreement shall be construed and interpreted according to the law of the State of Minnesota.

10.4  Notices.  All notices, requests, demands and other communications hereunder shall be in writing and shall be deemed to have been duly given if delivered by hand or mailed, certified or registered mail with first class postage prepaid:

    (a) If to the Seller, at:      Simplicity Gourmet International, Inc.
                                    Attn:  Jeff Henn
                                    1200 Ford Road
                                    Minnetonka, MN  55305

    (b) If to the Buyer, at:       NutriChef USA, Inc.
                                    Attn:  Arnold Johnson
                                    4020 South 57th Avenue, Suite 204
                                    Lake Worth, FL 33463

    (c) If to EAC, at:             Equitable Acceptance Corporation
                                    Attn:  Jeff Henn
                                    1200 Ford Road
                                    Minnetonka, MN  55305

10.5  Further Instrument.  Each of the parties hereto will on the Closing Date or such other date as the other party may request, without cost or expense to the party so requesting, execute and deliver or cause to be executed and delivered to such other party such further instruments of transfer and conveyance and will take such other action as may be reasonably required to more effectively consummate the transactions contemplated by this Agreement.

10.6  Counterparts.  This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

10.7  No Other Agreements.  This Agreement, together with the Exhibits attached hereto, set forth the entire agreement and understanding between the parties as to the subject matter hereof, and merges and supersedes all prior discussions, agreements and understandings of every and any nature between them.  This Agreement and said Exhibits may not be changed, modified or terminated, except by agreement in writing, signed by all of the parties hereto.

10.8  Headings.  The headings in the sections of this Agreement are inserted for convenience only and shall not constitute a part hereof.


IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

SELLER:                                                    BUYER:
SIMPLICITY GOURMET                         NUTRICHEF USA, INC.
INTERNATIONAL, INC.

By: _____              By: _____
    Its _____                       Its _____

                                                              GUARANTOR:

                                                              _____
                                                              Arnold Johnson

# EXHIBIT A and B

| SGI Asset List | Qty | | Qty | |
|---|---|---|---|---|
| Cubicles | 34 | Bridal Kits | | |
| Desks | 1 | Darren | | 1 |
| Large Work Tables (Ikea) | 1 | Kory | | 1 |
| Small Work Tables (Ikea) | 2 | Sean | | 1 |
| Filing Cabinets Large Horizontal Two Drawer | 2 | Andre | | 1 |
| Filing Cabinets Vertical | 3 | Sonny | | 1 |
| Chairs | 25 | Keith/Scott | | 1 |
| Leather Guest Chairs | 2 | Devlin | | 1 |
| Keyboards | 55 | Office | Skyline | |
| Mice | 38 | | | |
| Wyse Older | 24 | | | |
| Wyse New | 10 | Bridal Kit Includes | | |
| Round Tables | 2 | Skyline and Graphics | | |
| Folding Chairs | 11 | Nutri Chef Master Set | | |
| HP Laser Printer (Kellee's Office) | 1 | 21pc HS Set | | |
| Monitors | 25 | 5pc Bakeware | | |
| Mini Desk | 1 | 5pc Rectangular Bakeware | | |
| Canon DCR Scanner | 1 | SimpleKut | | |
| Paper Cutter | 1 | 5.5 Santoku | | |
| Bridal Lead Cards | 2000 | 5pc HS Cutlery and Universal Block | | |
| Friend of Bride | 10,000 | 8.5 Fry Pan | | |
| ECP Forms | 160 | 10.5 Fry Pan | | |
| Credit Apps | 114 | 11" Griddle | | |
| Cookware Brochures | 1600 | 3pc Hammered Bowls | | |
| Carlson Craft Certs | 1900 | Old Pots | | |
| Coupon Books | 100 | Paperwork and Literature | | |
| Plate Stands | 20 | Nutri Chef Cooking Show Banner | | |
| Banner Stands | 5 | NutriChef Register Here Banner | | |
| Various Office Supplies | ? | | | |

| | | | | |
|---|---|---|---|---|
| | | Bridal Show Kits | | 7 |
| | | Asset list Valuation | $ | 125,000.00 |

| Leads | | | | |
|---|---|---|---|---|
| Card leads | 40622 | $ | 101,555.00 | |
| Door lists | 62287 | $ | 124,574.00 | |
| Friend of the Bride | 4214 | $ | 8,428.00 | |
| List leads | 103590 | $ | 103,590.00 | |
| | | | $ | 338,147.00 |
| | | Total Valuation | $ | 463,147.00 |

# EXHIBIT C

PROMISSORY NOTE

$450,000.00                                                Minnetonka, Minnesota
                                                          December 1, 2014


        FOR VALUE RECEIVED, the Undersigned, NutriChef USA, Inc., a Florida
corporation, and Arnold Johnson, an individual, promise to pay Equitable Acceptance
Corporation, a Minnesota corporation ("EAC"), the principal amount of four hundred
fifty thousand dollars and no cents ($450,000.00), plus interest at the Annual Percentage
Rate of six percent (6%). The Undersigned further promise to pay EAC a monthly
payment commencing no later than February 15, 2015 of no less than six thousand
dollars ($6,000) until the balance is paid in full, and the monthly payment shall include
no less than seventy five percent (75%) of each monthly buyer rebate which NutriChef
earns by purchasing product from New Era, Inc.

        Prepayment shall be allowed in full or in part at any time without notice or
penalty.

Default Provisions.

        a.  Triggering Events.    Any one or more of the following events, which list
            is not exclusive or exhaustive, shall constitute a default entitling EAC to
            invoke the rights and remedies identified herein, or otherwise available to
            EAC pursuant to the law:

                i.   Failure to make any payment provided for herein in full within ten
                     (10) days of its due date;
                ii.  Filing of bankruptcy by the Undersigned;
                iii. The Undersigned is deemed in the reasonable discretion of EAC to
                     be insolvent; or
                iv.  Failure to comply in full with any obligations in this Agreement.

        b.  Waiver and/or Delay in Enforcement.        EAC may waive or delay
            enforcement of any of EAC's rights under this Agreement without losing
            them.

        c.  Consequences of Default.    In the event of a default hereunder, the
            Undersigned shall receive written notice by way of U.S. Mail of such
            default at the last known address of the Undersigned, and shall have five
            (5) days to cure all identified defaults. Should the Undersigned fail to
            timely cure any identified default, EAC may, in EAC's absolute and sole
            discretion, (1) accelerate, without notice, all payments under this

Agreement and demand full and immediate payment of same, and/or (2) exercise any and all rights EAC has or may have against the Undersigned pursuant to applicable law. If EAC pursues a default hereunder, EAC shall further be entitled to reimbursement for all collection costs, court costs and reasonable attorneys' fees.

## Defense and Indemnification.

The Undersigned agrees to fully defend and indemnify and hold EAC harmless from any and all damages, losses, liabilities, costs and expenses (including attorney fees) with respect to or in connection with any breach of any obligation, representation or warranty under this Promissory Note or any related document.

## Exclusive Jurisdiction.

The Undersigned hereby consent to the exclusive jurisdiction of the courts of the State of Minnesota in any and all actions or proceedings arising hereunder or pursuant hereto, and irrevocably agrees to service of process pursuant to Minnesota law.

## Governing Law.

This Promissory Note and all related documents shall be governed and construed in accordance with the laws of the State of Minnesota.

## Counterparts.

This Promissory Note and all related documents may be executed in several counterparts, each of which shall be deemed an original. Execution of any and all such documents shall constitute acknowledgement of receipt of a copy of all such documents.

## Severability.

In the event any part of this Promissory Note or related documents is found to be void, the remaining provisions of this Promissory Note and/or related documents shall nevertheless be binding upon the parties hereto as though the void parts were severed and deleted.

Promissory Note
Page 3 of 4

Benefit.

   This Agreement shall be binding upon, and shall operate for the benefit of, the parties hereto, as well as their respective heirs, successors, assigns, executors, administrators, subsidiaries, affiliates, officers, directors, employees, agents and representatives.

Modification.

   No change or modification of this Promissory Note or related documents shall be valid unless the same is in writing and signed by all the parties hereto.

Headings.

   The headings in this Promissory Note are for convenience of reference only and do not form a part hereof, and in no way interpret or construe the articles and/or sections contained therein.

Terminology.

   Unless the context hereof clearly requires otherwise, the singular form of any word shall include the plural, and vice versa, and the masculine form of any word shall include the feminine and vice versa.

Waiver.

   No waiver of any provisions of this Agreement shall constitute a waiver of any other provisions, nor shall any waiver constitute a continuing waiver unless otherwise expressly provided. All persons waive demand, presentment, protest, notice of nonpayment or dishonor and notice of any modification in terms of payments.

Attorney Disclosure.

   At the request of EAC, Daniel D. Hill of Snow, Christensen & Martineau (the "Firm"), has drafted this agreement and various related documents. The Undersigned acknowledges that the Firm has represented and continues to represent Simplicity Gourmet International, Inc., New Era, Inc. and Equitable Acceptance Corporation as its corporate counsel. **THE FIRM <u>DOES NOT</u> REPRESENT THE UNDERSIGNED.** The Undersigned have, at all relevant times hereto, had the opportunity to consult with their own legal counsel. The Undersigned and EAC, New Era, Inc. and Equitable Acceptance Corporation recognize that their interests under such documents may now or hereafter be adverse to, or in conflict with, the interests of one another. The Undersigned and EAC hereby consent to the Firm's representation of EAC in connection with the preparation and execution of such documents, and the Undersigned hereby agrees that at no time will such representation be construed, claimed, or deemed to be a beach of any

Promissory Note
Page 4 of 4

fiduciary relationship, a conflict of interest, or a violation of any other obligation of any party.  Furthermore, all of the parties hereto represent and warrant that this Agreement is an important document and that the Undersigned has made a conscious decision on whether to seek independent legal or accounting representation.

<u>CAUTION:  READ THIS ENTIRE DOCUMENT BEFORE SIGNING.</u>

THE UNDERSIGNED HAVE READ IN FULL THIS ENTIRE DOCUMENT AND HAVE HAD THE ●PPORTUNITY TO CONSULT WITH COUNSEL AS TO ITS LEGAL EFFECT AND MEANING PRIOR TO SIGNING.  THE UNDERSIGNED FURTHER AGREE TO EACH AND EVERY PROVISION HEREOF, AND HEREBY ACKNOWLEDGES RECEIPT OF A COPY HEREOF.

IN WITNESS WHEREOF, this Agreement has been executed the day, month and year first written above.

NUTRICHEF USA, INC.

By: _____
Its: _____

ARNOLD JOHNON
_____

4

# EXHIBIT D

## PERSONAL GUARANTY

For good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, and to induce Equitable Acceptance Corporation ("EAC"), and its successors, assigns, and representatives, to finance for the undersigned and NutriChef USA, Inc. an Asset Purchase and Sale Agreement dated December 1, 2014 and related documents and attachments (the "APSA"), the undersigned hereby absolutely and unconditionally guarantees to EAC the full and prompt performance and compliance, including but not limited to payment, with all liabilities and obligations of NutriChef USA, Inc. in the APSA and all related documents and attachments.

The undersigned further acknowledges and agrees:

1.      The undersigned waives all notices, demands and protests, and all other formalities of every kind in connection with the enforcement of the obligations hereunder, the omission of or delay in which might constitute grounds for relieving the undersigned of the obligations hereunder.  No failure on the part of EAC to exercise, and no delay in exercising any right, power or remedy hereunder shall operate as a waiver hereof of any right, power or remedy hereunder.

3.      EAC may take, or not take, in its reasonable discretion, action against NutriChef USA, Inc., without in any way impairing or affecting this Personal Guaranty.  EAC is under no obligation to take any action against NutriChef USA, Inc. or any other person or entity as a condition precedent to the undersigned being obligated to perform as agreed herein.

4.      This is a continuing guaranty of performance and compliance, including but not limited to payment, and shall remain in full force and effect and be binding upon the undersigned and his successors and assigns and shall inure to the benefit of EAC, its heirs, endorsees, successors, representatives and assigns.  The undersigned may not, without the written consent of EAC, revoke this Personal Guaranty.

5.      This document represents the entire agreement between EAC and the undersigned with respect to the matters referred to herein and no waiver or modification hereof shall be effective unless in writing and signed by EAC and the undersigned.

6.      The undersigned irrevocably submits to the jurisdiction of any Minnesota or Federal court sitting in Minnesota over any suit, action or proceeding arising out of or relating to this Personal Guaranty and agrees that EAC shall have the option, in its reasonable discretion, to lay the venue of any such suit, action or proceeding in the courts of the state of Minnesota, and waive any objection to such venue.  The undersigned further agrees to pay all costs incurred by EAC in enforcing this Personal Guaranty, including, without limitation, court costs and reasonable attorneys' fees, when incurred in a formal proceeding.

7.      This Personal Guaranty shall be governed by and construed and interpreted in accordance with the laws of the State of Minnesota applicable to contracts made in and performed in the State of Minnesota.

Dated:     11/20/14

Arnold Johnson

STATE OF  Florida        )
                                       ) ss.
COUNTY OF  Palm Beach   )

The foregoing Personal Guaranty was acknowledged before me this  20  day of
November , 2014 by  Person

NOTARY PUBLIC                      Luis Garcia

LUIS GARCIA
Notary Public - State of Florida
My Comm. Expires Oct 31, 2015
Commission # EE 142968

# EXHIBIT E

## MANAGMENT AGREEMENT

This **MANAGEMENT AGREEMENT** ("Agreement") is entered into this _1_ day of _December_, 2014, by and between New Era, Inc., 157 Airport Road, Clarksville, TN 37042, a Tennessee corporation and its affiliates, parent and/or holding companies and subsidiaries ("New Era") and NutriChef USA, Inc., 4020 South 57th Avenue, Suite 204, Lake Worth, FL 33463, a Florida corporation and its affiliates, parent and/or holding companies and subsidiaries ("NutriChef").

WHEREAS, New Era is in the business of manufacturing and selling consumer goods, including cookware, bakeware and cutlery; and

WHEREAS, NutriChef is in the business of marketing and selling consumer goods, including cookware, bakeware and cutlery; and

WHEREAS, New Era and NutriChef wish to do business together pursuant to the terms and conditions of this Agreement.

NOW THEREFORE and in consideration of this Agreement and the mutual promises herein contained, the parties hereto agree as follows:

1. PRODUCTS

    a. **General.** New Era will sell, and NutriChef will buy, New Era's cookware, bakeware and cutlery at competitive prices set by New Era, and consistent with New Era's then-existing buyer rebate program.

    b. **Exclusivity.**

        i. NutriChef, and all of its agents, representatives and/or employees, will at all times market, distribute and sell only cookware, bakeware and cutlery purchased from New Era.

        ii. With respect to the consumer bridal market, New Era will only sell cookware, bakeware and cutlery to NutriChef.

2. MANAGEMENT SUPPORT

    a. New Era will provide product and sales support to NutriChef and its agents, representatives and/or employees as needed and requested.

    b. New Era will assist financially NutriChef with conventions for NutriChef sales staff on the following additional terms and conditions twice a year as long as NutriChef is in full compliance with this Agreement and all related agreements:

        i. Xx 2% of adjusted wholesale purchase.
        ii. Xx not to exceed 50% of convention cost.

3. CONSIDERATION

    a. Annually, commencing December 1, 2014 and for the duration of this Agreement, NutriChef will pay to New Era three percent (3%) of NutriChef's total gross sales for the preceding twelve (12) months, or a pro rata portion of the preceding twelve (12) months in the event this Agreement terminates prior to the completion of any given twelve (12) month period.

    b. All such payments shall be made by NutriChef to New Era no later than one (1) calendar month following the completion of the period provided for in Section 3(a) herein.

    c. For the initial term of this Agreement, any and all such payments from NutriChef to New Era provided for in this Section 3 shall be capped at and shall not exceed total payments of nine hundred thousand dollars ($900,000). Should this Agreement renew beyond its initial term, any further payments and services provided for in this agreement are subject to negotiation.

4. PROPRIETARY RIGHTS, LICENSE AND CONFIDENTIALITY

    a. **New Era's Proprietary Rights.** New Era does NOT hereby grant NutriChef any right or license to use New Era's patents, copyrights, trademarks, know how, and other intellectual property rights for any purpose without the separate and written consent of New Era.

    b. **Confidentiality.** Notwithstanding anything herein to the contrary, NutriChef will not at any time make any use of (other than as provided for in this Agreement),

publish or disclose, or authorize anyone else to make use of, publish or disclose any confidential information, or that which is not generally available to the public, and/or which is the subject of New Era efforts to maintain confidentiality, unless authorized in writing and in advance. NutriChef shall immediately notify New Era in writing in the event NutriChef becomes aware of any independent use, publication or disclosure of New Era confidential, proprietary or otherwise legally protected information.

5.  LIMITED WARRANTY AND LIMITED LIABILITY

    a.  **Limited Warranty.** New Era warrants that its products which are the subject of this Agreement shall conform substantially to any unique specifications provided by NutriCheff and be free from material defect. THE WARRANTY SET FORTH IN THE FOREGOING SENTENCE IS THE ONLY WARRANTY, EXPRESS OR IMPLIED, CONCERNING THE PRODUCTS AND IS IN LIEU OF ANY OTHER REPRESENTATION OR WARRANTY, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE; provided, however, that the parties shall work mutually to ensure the product is fit for its intended use.

    b.  **Limited Liability.** IN NO EVENT SHALL NEW ERA BE LIABLE TO NUTRICHEF (OR ANY OTHER PARTY) FOR LOSS OF PROFITS OR INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL, OR OTHER SIMILAR DAMAGES ARISING OUT OF ANY BREACH OF THIS AGREEMENT OR OBLIGATIONS UNDER THIS AGREEMENT, NOR WILL NEW ERA BE LIABLE FOR ANY DAMAGES CAUSED BY DELAY IN DELIVERY OF THE PRODUCTS PURCHASED HEREUNDER, EXCEPT TO THE EXTENT SUCH DAMAGES ARE SUBJECT TO INDEMNIFICATION HEREUNDER OR ARE THE RESULT OF A VIOLATION OF INTELLECTUAL PROPERTY RIGHTS. BOTH PARTIES HAVE CONSIDERED THE MAKING OF EXPENDITURES IN PREPARING FOR PERFORMANCE OF THIS AGREEMENT AND POSSIBLE LOSSES AND DAMAGES INCIDENT AND RESULTING TO THEM IN THE EVENT OF ITS TERMINATION.

6. INDEMNIFICATION

Each party hereto shall indemnify and hold the other party harmless from all liability, loss, and expense incurred as a result of a claim for damage or injury caused by or relating to the negligence or willful misconduct of such indemnifying party.

7. FORCE MAJEURE

If the performance of this Agreement or any obligation hereunder, except the making of payments hereunder, is prevented, restricted or interfered with by reason of fire, flood, earthquake, hurricane or other casualty; labor disputes; inability to procure supplies or power; war or other violence; law, order, regulation, ordinance or requirement of any governmental agency; or any other act or condition beyond the reasonable control of the affected party, including the impracticability of delivery to NutriChef in the ordinary course of business, the party so affected, upon written notice to the other party, shall be excused from such performance to the extent of such prevention, restriction or interference.

8. TERM

This Agreement shall become effective as of December 1, 2014 and, subject to the terms and conditions herein, shall remain in full force and effect for a period of five (5) years. The parties may mutually agree in writing to renew this Agreement for an additional mutually agreed term.

9. TERMINATION

a. **Termination for Cause.** Either party may terminate this Agreement for cause at any time. "For Cause" shall mean any event in which either party materially or repeatedly defaults in the performance of any of its duties or obligations set forth in this Agreement, and such default is not cured within thirty (30) calendar days after written notice is given to the defaulting party specifying the default; provided, however, that in the event of a payment default the cure period shall be only ten (10) calendar days. In such event, then the party not in default may, by giving written notice thereof to the defaulting party, terminate this Agreement or the applicable purchase order relating to such default, as of the date specified in such notice of termination.

b. **Immediate Termination.** Either party may immediately terminate this Agreement and any pending purchase orders by giving written notice to the other party in the event of (a) the liquidation or insolvency of the other party, (b) the

4

appointment of a receiver or similar officer for the other party, (c) an assignment by the other party for the benefit of all or substantially all of its creditors, (d) entry by the other party into an agreement for the composition, extension, or readjustment of all or substantially all of its obligations, (e) the filing of a petition in bankruptcy by or against a party under any bankruptcy or debtors' law for its relief or reorganization which is not dismissed within 60 days, or (f) the other party ceasing to conduct business in the normal course.

c. **Effect of Termination.** The expiration or termination of this Agreement shall not affect any accrued rights or liabilities of either party or affect the coming into force or the continuance in force of any provision which is expressly or by implication intended to come into or continue in force on or after such termination, including but not limited to the rights and obligations set forth herein.

    i. If this Agreement has been terminated as a result of a fundamental breach by NutriChef, New Era will have the sole discretion whether to reject or affirm the outstanding orders from NutriChef.

    ii. Upon termination of this Agreement, NutriChef shall purchase all finished product, and all unfinished product shall be the sole and unfettered property of NutriChef for which NutriChef shall assume delivery responsibility.

    iii. If this Agreement is terminated by either party for any reason prior to the original term set forth in Section 8 herein, NutriChef's obligations under Section 3 herein shall continue uninterrupted and unhindered.

10. RESTRICTIVE PROVISIONS

a. NutriChef will not, at any time, either while working with New Era or afterward, make any independent use of, publish or disclose, or authorize anyone else to make use of, publish or disclose, any of New Era's trade secrets, unless authorized in writing in advance by New Era.

b. With respect to information that is not a trade secret, but is proprietary in nature or is otherwise a subject of efforts to maintain confidentiality, NutriChef and all its agents, representatives and/or employees will not, at any time, either while working with New Era or for a period of two (2) years following termination of this Agreement, make any independent use of, publish or disclose, or authorize

anyone else to make use of, publish or disclose, any of New Era's confidential or proprietary information, unless authorized in writing in advance by New Era.

c.  During the effective period of this Agreement, and for a period of one (1) year thereafter, NutriChef and all its agents, representatives and/or employees, shall not, directly or indirectly, for themselves or on behalf of or in conjunction with any other person, company, partnership, corporation, business, group or other entity (each, a "Person"):

   i.  Solicit or attempt to solicit, recruit or attempt to recruit, any employee, agent or contract worker of New Era with whom NutriChef had contact during the course of its business relationship with New Era for any purpose related or similar to this agreement; or

   ii.  Request any customers or clients of NutriChef and/or New Era, or their affiliates, subsidiaries and/or parent company, to curtail or cancel their business with New Era or its affiliates or to do business with any person that is or may be in competition with New Era; or

   iii.  Solicit, canvass, or accept any business or transaction for themselves or for any other person, firm, or corporation or business identical or similar to any business of New Era or its affiliates; or

   iv.  Induce, or attempt to influence, any employee or agent or representative of New Era or its affiliates to terminate employment or their business relationship with New Era or its affiliates, or to enter into any employment or other business relationship with any other person, firm or corporation; or

   v.  Act or conduct themselves in any manner, or make any communication that s/he/it shall have reason to believe is inimical or contrary to the best interests of New Era, its affiliates, or their officers, directors, shareholders, and employees.

d.  NutriChef shall not perform any act in violation hereof through any other person or entity or through any plan, scheme, or design calculated to circumvent the requirements hereof.

e.  NutriChef acknowledges and agrees that the above restrictions are reasonable as to duration and scope. NutriChef waives any objection thereto, and covenants not

to institute any suit or proceeding, or otherwise advance any position or
contention to the contrary.

f.  NutriChef represents and warrants to New Era that its experience and capabilities
are such that it, along with its agents, representatives and employees, can obtain
employment without breaching the terms and conditions of this article, and that
their obligations under the provisions of this article (and the enforcement thereof
by injunction or otherwise) will not prevent them from earning a livelihood.

g.  These covenants on the part of NutriChef are independent of any other provisions
of this Agreement, and the existence of any claim or cause of action by NutriChef
against New Era, whether predicated on this Agreement or otherwise, shall not
constitute a defense to the enforcement by New Era of this covenant.

h.  In the event NutriChef is in breach of any of the provisions of this Agreement, the
period of proscription from doing the act or acts that constitute a breach of this
Agreement shall be extended for an additional period of one (1) year from the
date that NutriChef, and/or any of its agents, representatives or employees,
ceased, whether voluntarily or by court order, engaging in said actions.

i.  In the event that a court of competent jurisdiction determines that any restrictive
covenant in this Agreement is unenforceable in whole or in part for any reason,
including, without limitation, the duration, scope and remedies set forth herein,
then same shall not be void, but rather shall be enforced to the extent that same is
deemed to be enforceable by said court, as if originally executed in that form by
the parties hereto.

j.  The covenants in this Agreement are severable and separate, and the
unenforceability of any specific covenant shall not affect the provisions of any
other covenant.

k.  Every agent, representative or employee of NutriChef shall agree in writing to be
bound by the terms of this Agreement.

l.  **NutriChef has carefully read and considered the provisions of this
Agreement and, having done so, agrees that the restrictive covenants herein
impose a fair and reasonable restraint and are reasonably required to
protect the interests of New Era. NutriChef covenants that it will not
challenge the enforceability of this Agreement nor will it raise any equitable
defense to its enforcement.**

11. <u>MISCELLANEOUS</u>

a.  **Subcontractors, Agents, Representatives and/or Employees.**  In the event
NutriChef uses any subcontractors, agents, representatives and/or employees,

NutriChef shall remain responsible and liable for any and all such subcontractors, agents, representatives and/or employees complying in full with all terms of this Agreement.

b. **Notices.** Any and all notices required or permitted under this Agreement shall be in writing and shall be personally delivered, sent by registered mail, a recognized overnight delivery service, or by other means which affords the sender evidence of delivery, or of rejected delivery, to the respective party at the addresses shown above, unless and until a different address has been designated by written notice to the other party. Any notice by a means which affords the sender evidence of delivery, or rejected delivery, shall be deemed to have been given at the date and time of receipt or rejected delivery.

c. **Amendment and Waiver.** This Agreement may not be changed, modified, amended, extended, terminated, waived or discharged except by an instrument in writing signed by the party against which enforcement is sought. No failure to enforce the terms of this Agreement shall constitute a continuing waiver of that provision or a waiver of any other provision.

d. **Interpretation.** The parties each acknowledge that this Agreement was fully negotiated between them and, therefore, no provision hereof shall be interpreted against any party because such party or its legal representative drafted such provision.

e. **Recitals and Headings.** The recitals set forth at the beginning of this Agreement are hereby incorporated by this reference, and each party represents and warrants to the other that such recitals are true and correct. Article and section headings used herein are for convenience only, are not a part of this Agreement, and shall not be used in construing it.

f. **Cooperation.** Each of the parties agrees to execute and deliver such further documents and to cooperate in such manner as may be necessary to implement and give effect to the agreements contained herein.

g. **Assignment; Binding Effect.** Any assignment or attempted assignment by either party, in whole or in part, by operation of law or otherwise, of its rights or obligations under this agreement (other than the right to receive payments hereunder) without the other party's prior express written consent shall be void, except that: (1) either party may assign its rights under this Agreement to a wholly-owned subsidiary, or a parent or holding company, provided the assigning

party remains liable for performance of its obligations under this Agreement; and (2) NutriChef may assign its rights under this Agreement to any party succeeding to substantially all of NutriChef's business, provided that such successor shall be and agrees in writing to be responsible for all of NutriChef's obligations hereunder; and (3) subject to the foregoing, this Agreement shall bind and inure to the benefit of the successors and assigns of the parties. Any assignment, delegation or transfer made in breach of this Section shall be null and void.

h. **Severability.** If, but only to the extent that, any provision of this Agreement is declared or found to be illegal, unenforceable or void, then both parties shall be relieved of all obligations arising under such provision, it being the intent and agreement of the parties that this Agreement shall be deemed amended by modifying such provision to the extent necessary to make it legal and enforceable while preserving its intent.

i. **Entire Agreement.** This Agreement, including any Exhibits and documents referred to in this Agreement or attached hereto, constitutes the entire and exclusive statement of Agreement between the parties with respect to its subject matter, superseding any and all previous proposals, representations or statements, oral or written. Any previous agreements between the parties pertaining to the subject matter of this Agreement are hereby expressly cancelled and terminated. The parties agree that unless otherwise agreed to in writing by the party intended to be bound, the terms and conditions of this Agreement shall prevail over any contrary terms in any purchase order, sales acknowledgment, confirmation or any other document issued by either party affecting the purchase or sale of product hereunder. This Agreement may not be released or modified except by the mutual written consent of both parties as attested to by an instrument signed by an authorized officer of each of them.

j. **Relationship of Parties.** The parties are performing pursuant to this Agreement only as separate and distinct entities. Nothing set forth in this Agreement shall be construed to create the relationship of principal and agent between New Era and NutriChef or creating a joint venture or partnership. Neither party shall act or represent itself, directly or by implication, as an agent or other representative of the other party.

k. **Dispute Resolution.** Any controversy or claim arising out of, or relating to this Agreement, or the breach thereof, shall be determined by arbitration as governed by and interpreted under the internal laws (as opposed to conflict of law provisions) of the State of Minnesota, and the Federal Arbitration Act,

administered by the American Arbitration Association under its Commercial Arbitration Rules in effect at such time and agree to execute any and all paperwork necessary to effectuate same; provided, however, that either party may request and obtain preliminary injunctive relief pursuant to the applicable law (pending and subject to the arbitration award). All arbitration hearings shall be conducted in Hennepin County, Minnesota, U.S.A., by a single arbitrator who, at the request of either party, shall provide a written reasoned opinion. The award of the arbitrator shall be final and binding and judgment thereon may be entered by a court of competent jurisdiction. Should any provision, section or part of the Agreement or this arbitration agreement be deemed illegal, invalid or unenforceable by a court of competent jurisdiction, that element of the Agreement or this arbitration agreement may be severed and shall not affect the validity or enforceability of the remaining portions of the Agreement or this arbitration agreement in that jurisdiction and judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof. In legal proceedings instituted to enforce this Agreement and/or this arbitration agreement, the party who prevails in such proceedings shall be entitled to the award of its reasonable attorney's fees and dispute resolution costs, plus fees and costs incurred by it in executing and/or collecting any judgment, at all trial and appellate levels. This provision shall continue in full force and effect subsequent to and notwithstanding the expiration or termination of this Agreement. The United Nations Convention on Contracts for the International Sale of Goods and the United Nations Convention on the Limitation Period in the International Sale of Goods, as amended from time to time, are excluded from application to this Agreement.

l.  **Authority of Executing Party.** The parties executing this Agreement warrant that they have the requisite authority to do so.

m.  **Counterparts.** This Agreement may be executed in any number of counterparts and delivered electronically with the same effect as if the signature to each counterpart were original and on the same document, and all such counterparts will be deemed one and the same agreement; however, this Agreement shall be of no force or effect until executed by both parties.

NEW ERA, INC.

By: _____

Its: _____

NUTRICHEF USA, INC.

By: _____

Its: _____

# EXHIBIT F

## GENERAL ASSIGNMENT AND BILL OF SALE

Pursuant to the terms and conditions of that certain Asset Purchase and Sale Agreement dated December 1, 2014, between Simplicity Gourmet International, Inc. ("SGI") and NutriChef USA, Inc., SGI does hereby sell, assign and transfer unto NutriChef USA, Inc., all right, title and interest in and to the attached list of assets.

IN WITNESS WHEREOF, the Undersigned has executed and delivered this document effective _December 1_, 20 14.

SIMPLICITY GOURMET INTERNATIONAL, INC.
By: _____ Bobby Briggs
Its: _President_

# Exhibit 2

*Km*

## FULL RECOURSE
## MASTER DEALER AGREEMENT

This AGREEMENT is entered into this **3** day of **Sept** , **2014** , by and between Equitable Acceptance Corporation ("EAC") and **Arnold Johnson / Nutrichef USA Inc** ("Dealer").

RECITALS.  Dealer proposes to sell to EAC from time to time, conditional sales contracts or other instruments evidencing installment payment obligations owing Dealer rising from the sale of certain goods.  EAC may in its sole discretion determine to purchase such contracts.  The parties thus wish to set forth herein the terms and conditions upon which such purchases may be made.

NOW THEREFORE, in consideration of the mutual covenants and agreements set forth herein, the parties hereto agree as follows:

Section 1.  Purchase and Assignment of Customer Obligations – General Terms.

(a)      EAC may from time to time purchase retail installment contracts, promissory notes, security agreements and other instruments evidencing installment payment obligations ("Customer Obligations") offered to it by Dealer, which meet standards acceptable to EAC.  However, EAC shall have no obligation to purchase ny such Customer Obligation offered to it.

(b)      Such Customer Obligations sh ll be substantially in the form provided by EAC to Dealer from time to time.

(c)      All Customer Obligations purch sed by EAC shall be assigned to EAC and shall be duly endorsed or assigned to EAC by Dealer in a manner and form acceptable to EAC.  In the event Dealer omits to assign or endorse any Customer Obligation purchased by EAC, Dealer will immediately correct the same upon EAC's request.

(d)      Except as otherwise agreed in writing by EAC, any such purchases by AC shall be on a **full recourse** basis consistent with the terms of Appendix 1 and this Agreement.  Unless otherwise provided herein or agreed to in writing then, all Customer Oblig tions purchased by EAC shall be on a full recourse basis, such recourse not being limited in any manner whatsoever; each and every Customer Obligation purchased by EAC from Dealer which defaults in any manner and for any reason shall be repurchased by Dealer from EAC consistent with the terms of Section 4 herein and/or EAC may in its sole discretion satisfy any such Customer Obligation out of the reserve fund established pursuant to Section 2 herein.  All Customer Obligations are also independently subject to repurchase as provided in Sections 3 and 4 herein.  Each Customer Obligation shall also conform to Dealer's representations and warranties in all respects.

MASTER DEALER AGREEMENT
Page 2 of 9

Section 2.  Dealer Reserve Account

(a)     EAC shall pay to Dealer an agreed upon amount for Customer Obligations.  From such agreed upon amount, EAC may in its sole discretion retain in a Reserve Fund a portion of the total unpaid balance of the purchased Customer Obligations which Reserve Fund shall be used to pay any defaults, unpaid balances, losses, costs or expenses, including reasonable attorney fees, of any kind on any Customer Obligation, or any and all sums due for any reason from Dealer to EAC.  The retained reserve amount is subject to change in EAC's sole discretion.  Should more than one Reserve Fund be established by EAC for Dealer, all such Reserve Funds, whenever established, will be cross collateralized.  In other words, all reserve funds generated by the purchase of any Customer Obligations by EAC from Dealer may in EAC's sole discretion be pooled and such pool of reserve funds may be accessed by EAC pursuant to this Section 2(a).

(b)     In the event a Reserve Fund is insufficient to fully reimburse EAC any such amount referred to in paragraph 2(a) herein, such deficiency shall be considered a loan to Dealer.  Any such loan shall be repaid within thirty (30) days after request by EAC and shall bear interest at an annual percentage rate of 18 percent, from the date EAC requests payment of such deficiency until it is paid in full.

(c)     In the event EAC is fully reimbursed on any Customer Obligation by payments from Dealer's Reserve Fund, EAC shall reassign, to the extent EAC still has any rights or interest in the Customer Obligation in question, such Customer Obligation to Dealer upon written demand from Dealer.

(d)     The Reserve Fund shall be retained by EAC, without any interest accruing to the benefit of Dealer unless agreed in writing otherwise, until such time as EAC, in its sole discretion, determines the Reserve Fund should be discontinued, or, EAC has received payment in full and been fully reimbursed for all Customer Obligations and all charges related thereto.  Periodic adjustments, however, may be made to the Reserve Fund in EAC's sole discretion.

Section 3.  Warranties and Representations.

Dealer hereby represents and warrants the following:

(a)     All documents evidencing Customer Obligations assigned to EAC are genuine and the only instruments executed for the purchased goods, and each such document has not been altered or modified subsequent to its execution, except for such alterations or modifications as have been acknowledged and initialed by the customer and Dealer.

(b)     Each Customer Obligation is legal, valid and enforceable in all respects and shall remain free from defenses except as otherwise provided by law.

2

MASTER DEALER AGREEMENT
Page 3 of 9

(c)     The contents of any forms used by Dealer, and not supplied by EAC, are legally sufficient, binding and enforceable obligations.  Any such forms used by Dealer contain such disclosures and notices, as are required by applicable laws and regulations.

(d)     Dealer has not engaged in any unfair credit or trade practice or charged any usurious interest rate, finance charge or time price differential, as the case may be, in violation of any applicable laws or regulations, or, violated any applicable law or regulation.

(e)     All statements contained in each Customer Obligation and related documentation are true to the best of Dealer's knowledge after due inquiry.

(f)     The purchase price of the purchased goods stated on each Customer Obligation represents the fair market value of such purchased goods.

(g)     The unpaid principal balance shown on each Customer Obligation is correct.

(h)     The purchased goods have been delivered and accepted, and Dealer has complied with all its obligations with respect thereto.

(i)     Dealer will not, without the prior written consent of EAC, accept collection or payments on Customer Obligations assigned to EAC, repossess or consent to the return of any purchased goods, or modify the terms of any Customer Obligation.

(j)     The customer, and any co-buyer and/or guarantor, each has legal capacity to contract, and the Customer Obligation is legal, valid and enforceable against the customer, and any co-buyer and/or guarantor.

(k)     All signatures appearing on the Customer Obligations are those of the persons with legal capacity to contract and are genuine and authorized, and have not been secured by any coercion, misrepresentation, fraud, deceit or other wrongdoing on the part of Dealer.

(l)     The amount and manner of payment of a down payment, if any, made by the customer is accurately disclosed on the Customer Obligation and all related documentation, and said down payment has been received by Dealer in cash or cash equivalent and has not been separately financed by Dealer.

(m)     The purchased goods have not been rebuilt nor "marked" or "branded" in any manner inconsistent with original goods.

(n)     The buyer or obligor identified on the Customer Obligation is not acting on behalf of or for the benefit of another when purchasing the property.

(o)     All disclosures required by law to be made to customer, or any co-buyer and/or guarantor, prior to signing the Customer Obligation were properly made.

3

MASTER DEALER AGREEMENT
Page 4 of 9

(p)     Title to the purchased goods at the time of sale was properly vested in Dealer free of any liens and encumbrances.

(q)     The cash price of the purchased goods as shown in the Customer Obligation is the "cash price" as defined by the federal Truth In Lending Act, and applicable state laws. The price of the purchased goods is the price charged by Dealer for substantially similar purchased goods in cash transactions, and was not increased because the purchased goods were sold in a credit transaction.

(r)     The purchase price of any accessories, service contracts, warranties or similar products or services is the fair market retail value of such products or services, has not been overstated or inflated in any way, and represents the price for such products or services imposed by Dealer in cash sales of such products or services. ·

(s)     Dealer has not increased the purchase price of any purchased goods or services, or the cost of financing, because the Customer Obligation involves a member of a protected class as defined by federal and/or state law.

(t)     Dealer holds all necessary licenses to sell the purchased goods or services or to execute Customer Obligations, all of which are valid and in good standing, are not suspended or subject to any claim of violation or proceeding to terminate such licenses.

(u)     Dealer has not made any side agreements with the customer with regard to the Customer Obligation.

(v)     The customer has not, prior to assignment, defaulted in the performance of the Customer Obligation and has not alleged any failure in the performance of, or breach of warranty with respect to the purchased goods.

(w)     All purchased goods sold pursuant to a Customer Obligation are merchantable, fit for their ordinary purpose and intended use, and will not support a sufficient defense to payment.

The foregoing warranties and representations are in addition to those contained in any assigned Customer Obligation.

Section 4. Repurchase of Customer Obligations.

(a)     Dealer will repurchase any Customer Obligation assigned to EAC pursuant to this Agreement as to which any one or more of the following circumstances exist:

   1)      Any representation or warranty made by Dealer, including but not limited to those in Section 3 of this Agreement, has in any material respect proven to be untrue in the reasonable belief of EAC; or

4

MASTER DEALER AGREEMENT
Page 5 of 9

2)   A customer or any person on a Customer Obligation asserts a valid claim or defense against EAC, which such person could assert against Dealer as the seller of the goods and/or services which are the subject of the Customer Obligation; or

3)   Dealer takes or fails to take any action of any kind which affects the validity or enforceability of the Customer Obligation in the reasonable belief of EAC; or

4)   As to any Customer Obligation which Dealer has endorsed and assigned to EAC with full recourse, in the event there is a default of any kind on such Customer Obligation.

(b)   In any case of repurchase under this Section, Dealer will pay to EAC an amount equal to (1) if the finance charge on the Customer Obligation was determined on a simple interest basis, the original purchase price paid by EAC, plus uncollected interest accrued on the Customer Obligation, plus any expenses of collection incurred by EAC by the Dealer, including attorneys' fees, less all principal sums received by EAC on such Customer Obligation, or, (2) if the finance charge under the Customer Obligation was determined on a pre-computed basis, the unpaid balance of the Customer Obligation, plus any expenses of collection incurred by EAC after default by Dealer, including attorneys' fees, less the unearned portion of the original finance charge included in the Customer Obligation (computed as if the Customer Obligation had been prepaid in full).

(c)   Such payment shall be made by Dealer within ten (10) days after the request for repurchase and shall bear interest at an annual percentage rate of 18 percent from the date EAC requests repurchase until paid in full.

(d)   All Customer Obligations repurchased by Dealer hereunder shall be reassigned to Dealer, without recourse to EAC, and without warranties, express or implied, and shall be delivered to Dealer after payment to EAC.  Dealer's obligation to repurchase a Customer Obligation shall not be affected by any change in the terms of payment under the Customer Obligation or by the release or non-perfection of any security interest.  EAC shall not be bound to exhaust its recourse against any security before being entitled to payment by Dealer.  Dealer waives all notice which Dealer may be entitled to receive, and waives all set-offs and counterclaims.

(e)   Dealer's failure to respond to EAC's demand for repurchase of a Customer Obligation within ten (10) days of EAC's written demand for repurchase thereof shall raise a rebuttable presumption that such repurchase is required pursuant hereto.

Section 5.  Indemnity.

(a)   In the event any claim or defense is raised against EAC or Dealer in connection with any Customer Obligation, which Dealer can be required by EAC to repurchase under Section 4 of this Agreement, Dealer shall indemnify, save harmless and defend EAC in any action or actions, whether at law or in equity, in which EAC is made a party, against all costs, expenses and attorneys' fees incurred by EAC in any such action, as

5

MASTER DEALER AGREEMENT
Page 6 of 9

well as against any set off, recoupment or judgment awarded, taken or allowed against EAC in any such action.  If EAC shall deem it necessary, EAC shall have the right in its sole discretion to select its own counsel and conduct and supervise its own involvement in such action, and said rights shall not prejudice EAC's rights under this Section 5.

(b)      EAC shall not compromise and settle any such action without the prior written consent of Dealer; provided, however, Dealer's consent thereto shall not be unreasonably withheld.  Dealer shall indemnify EAC for its reasonable costs, expenses and attorneys' fees so incurred, as well as for any loss to EAC due to such compromise or settlement.

(c)      All reasonable costs, expenses and attorneys' fees, as well as the amount of any judgment, set off or recoupment so incurred shall be paid to EAC within thirty (30) days after request by EAC, and shall bear interest at an annual rate equal to the lesser of 1% in excess of the Prime Rate of Interest and the maximum rate allowed by law from the date of EAC's request until it is paid in full.

Section 6. Notices.

Any notice, demand, communication or writing required or permitted by this Agreement shall be in writing and shall be effective upon its deposit into the regular United States mail, at any United States Post Office, or Branch thereof, postage prepaid, and addressed to the parties as follows:

EAC:          Equitable Acceptance Corporation
              Attn:  Jeff Henn
              1200 Ford Road
              Minnetonka, MN  55305

DEALER:       Nutri Chef USA
              4020 S. 57th Ave #e204
              Lake Worth, FL 33463

Section 7. Waiver – Remedies Cumulative

No delay on the part of a party hereto in the exercise of any right or remedy shall operate as a waiver thereof by such party, and no single or partial exercise by such party of any right or remedy shall preclude other and further exercise thereof or the exercise of any other right or remedy, all remedies hereunder and otherwise provided by law being cumulative.  Dealer's obligations hereunder shall not be affected by any extension, renewal, modification or other change in the manner, place or terms of payment of any Customer Obligation, or by the release of or settlement with any party liable for payment of any Customer Obligation, and EAC shall not be required to exhaust its rights and remedies under the Customer Obligation or against other persons or collateral before being entitled to payment in accordance with this Agreement.

6

MASTER DEALER AGREEMENT
Page 7 of 9

Section 8. Termination.

This Agreement may be terminated by either party hereto at any time with or without fault or default by written notice given as provided herein; provided, however, that such termination shall in no way affect, and that this Agreement shall remain fully operative as to, any transactions entered into or rights granted or obligations incurred prior to such notice.  .

Section 9. Books and Records.

Dealer agrees that EAC may inspect Dealer's records as they pertain to this Agreement. Such inspections may be made as frequently as EAC deems necessary. Dealer also agrees to provide periodically EAC with signed financial statements of Dealer. Dealer agrees that such financial statements will be true and correct in all respects. EAC will hold all such information for its internal use and will treat all financial information supplied by Dealer with the same level of confidentiality as it applies to its own confidential information.

Section 10. Dealer Not Agent of EAC.

This Agreement does not make Dealer an agent or representative of EAC for any purpose or reason, and Dealer agrees not to represent to any person or entity that it is an agent or representative of EAC. Dealer is not granted any express or implied right to bind EAC in any manner whatsoever.

Section 11. Miscellaneous.

(a)     This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which counterparts of this Agreement taken together shall constitute but one and the same instrument.

(b)     Section headings used in this Agreement are for convenience only and shall not affect the construction of this Agreement.

(c)     This Agreement shall be construed in accordance with the laws of the State of Minnesota.

(d)     Wherever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

(e)     This Agreement shall be binding upon and inure to the benefit of Dealer and EAC, and their respective successors, heirs and assigns, except Dealer shall not have the

7

**MASTER DEALER AGREEMENT**
Page 8 of 9

right to assign its rights hereunder or any interest herein without the prior written consent of EAC.

(f)     EAC shall receive from Dealer all reasonable costs, expenses and attorneys' fees incurred by EAC in enforcing the terms of this Agreement.

(g)     This Agreement may be amended only in a writing signed by both parties hereto.

(h)     EACH PARTY WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS (i) UNDER THIS AGREEMENT OR ANY RELATED AGREEMENT OR UNDER ANY AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT DELIVERED OR WHICH MAY IN THE FUTURE BE DELIVERED IN CONNECTION HEREWITH, OR (ii) ARISING FROM ANY RELATIONSHIP EXISTING IN CONNECTION WITH THIS AGREEMENT, AND AGREES THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.

(i)     Dealer waives notice of acceptance of this Agreement, and, as to each Customer Obligation purchased hereunder, waives presentment or other demand for payment, notice of dishonor or other notice of non-payment, protest and any and all other notices to which Dealer might otherwise be entitled.

(j)     Any reserve fund account of Dealer shall be under the exclusive control of EAC, and Dealer acknowledges that any such account stands as security for payment of Customer Obligations and Dealer's obligations hereunder, and Dealer has no right to such account except as expressly provided in this Agreement.

(k)     If any payments are made to Dealer with respect to any Customer Obligation after purchase of such Customer Obligation by EAC, Dealer will receive and hold such payments in trust for EAC without commingling them with the funds of Dealer and will promptly deliver such payments to EAC.  Dealer also hereby irrevocably appoints EAC as Dealer's attorney-in-fact, with full power of substitution and revocation, to endorse Dealer's name to any check or other remittance offered as payment on a Customer Obligation purchased by EAC, and to make insurance claims on property injured in a casualty loss.  If any property described in a Customer Obligation purchased by EAC shall come into Dealer's possession by virtue of repossession, voluntary surrender or otherwise, Dealer shall promptly notify EAC and deliver such property to EAC on demand, or otherwise hold and protect such property at no expense to EAC, if EAC so requests, for a period of not more than ninety (90) days.

MASTER DEALER AGREEMENT
Page 9 of 9

IN WITNESS HEREOF, this Agreement has been duly executed as of the day and year above first written.

Subscribed and sworn to before me
This 3rd day of Sept, 2014

ELISA Whitehall
Notary Public

My commission expires 9/29/17

DEALER
By:
Its:

EQUITABLE ACCEPTANCE CORPORATION
By:
Its:

ELISA WHITEHALL
Notary Public - State of Florida
My Comm Expires Sep 29, 2017
Commission # FF 058404

9

Km

## PERSONAL GUARANTY

For good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, and to induce Equitable Acceptance Corporation, 8421 Wayzata Boulevard, Suite 300, Golden Valley, MN 55426, and its successors, assigns, and representatives, ("EAC") to enter into a Master Dealer Agreement with Arnold Johnson ("Dealer"), dated 11/6/13 ("MDA"), the undersigned hereby absolutely and unconditionally guarantees to EAC the full and prompt performance and compliance, including but not limited to payment, with all liabilities and obligations of Dealer as described in the MDA.

The undersigned further acknowledges and agrees:

1.     EAC may, at any time and from time to time, without notice to or consent of the undersigned, extend, extend, alter or modify Dealer's obligations under the MDA or any Customer Obligation as defined in the MDA, without in any way impairing or affecting this Personal Guaranty.

2,     The undersigned waives all notices, demands and protests, and all other formalities of every kind in connection with the enforcement of the obligations hereunder, the omission of or delay in which might constitute grounds for relieving the undersigned of the obligations hereunder. No failure on the part of EAC to exercise, and no delay in exercising any right, power or remedy hereunder shall operate as a waiver hereof of any right, power or remedy hereunder.

3.     EAC may take, or not take, in its sole and absolute discretion, action against Dealer, without in any way impairing or affecting this Personal Guaranty. EAC is under no obligation to take any action against Dealer or any other person or entity as a condition precedent to the undersigned being obligated to perform as agreed herein.

4.     This is a continuing guaranty of performance and compliance, including but not limited to payment, and shall remain in full force and effect and be binding upon the undersigned and its successors and assigns and shall inure to the benefit of EAC, its endorsees, successors, representatives and assigns. The undersigned may not, without the written consent of EAC, revoke this Personal Guaranty.

5.     This document represents the entire agreement between EAC and the undersigned with respect to the matters referred to herein and no waiver or modification hereof shall be effective unless in writing and signed by EAC and the undersigned.

6.     The undersigned irrevocably submits to the jurisdiction of any Minnesota or Federal court sitting in Minnesota over any suit, action or proceeding arising out of or relating to this Personal Guaranty and agrees that EAC shall have the option, in its sole discretion, to lay the venue of any such suit, action or proceeding in the courts of the state of Minnesota or those of the United States of America sitting within Minnesota, and waive any objection to such venue. The undersigned further agrees to pay all costs incurred by EAC in enforcing this Personal Guaranty, including, without limitation, court costs and reasonable attorneys' fees, whether incurred in a formal proceeding or otherwise.

7.     This Personal Guaranty shall be governed by and construed and interpreted in accordance with the laws of the State of Minnesota applicable to contracts made in and performed in the State of Minnesota.

Dated: 11/6/13

_____
Undersigned

Arnold Johnson
Name printed

STATE OF Florida )
                        ) ss.
COUNTY OF Palm Beach )

The foregoing Personal Guaranty was acknowledged before me this 6th day of November, 2013 by Arnold Johnson.

Beth Whitehall
NOTARY PUBLIC



ELISA WHITEHALL
Notary Public - State of Florida
My Comm. Expires Sep 29, 2017
Commission # FF 058409

*IB*

## FULL RECOURSE
## MASTER DEALER AGREEMENT

This AGREEMENT is entered into this 17 day of ___Aug___, 2011 by and between Equitable Acceptance Corporation ("EAC") and _____Arnold Johnson - Chef Master_____ ("Dealer").

RECITALS. Dealer proposes to sell to EAC from time to time, conditional sales contracts or other instruments evidencing installment payment obligations owing Dealer arising from the sale of certain goods.  EAC may in its sole discretion determine to purchase such contracts.  The parties thus wish to set forth herein the terms and conditions upon which such purchases may be made.

NOW THEREFORE, in consideration of the mutual covenants and agreements set forth herein, the parties hereto agree as follows:

Section 1.  Purchase and Assignment of Customer Obligations – General Terms.

(a)      EAC may from time to time purchase retail installment contracts, promissory notes, security agreements and other instruments evidencing installment payment obligations ("Customer Obligations") offered to it by Dealer, which meet standards acceptable to EAC.  However, EAC shall have no obligation to purchase any such Customer Obligation offered to it.

(b)      Such Customer Obligations shall be substantially in the form provided by EAC to Dealer from time to time.

(c)      All Customer Obligations purchased by EAC shall be assigned to EAC and shall be duly endorsed or assigned to EAC by Dealer in a manner and form acceptable to EAC.  In the event Dealer omits to assign or endorse any Customer Obligation purchased by EAC, Dealer will immediately correct the same upon EAC's request.

(d)      Except as otherwise agreed in writing by EAC, any such purchases by EAC shall be on a **full recourse** basis consistent with the terms of Appendix 1 and this Agreement.  Unless otherwise provided herein or agreed to in writing then, all Customer Obligations purchased by EAC shall be on a full recourse basis, such recourse not being limited in any manner whatsoever; each and every Customer Obligation purchased by EAC from Dealer which defaults in any manner and for any reason shall be repurchased by Dealer from EAC consistent with the terms of Section 4 herein and/or EAC may in its sole discretion satisfy any such Customer Obligation out of the reserve fund established pursuant to Section 2 herein.  All Customer Obligations are also independently subject to repurchase as provided in Sections 3 and 4 herein.  Each Customer Obligation shall also conform to Dealer's representations and warranties in all respects.

MASTER DEALER AGREEMENT
Page 2 of 9

Section 2.  Dealer Reserve Account

(a)   EAC shall pay to Dealer an agreed upon amount for Customer Obligations.  From such agreed upon amount, EAC may in its sole discretion retain in a Reserve Fund a portion of the total unpaid balance of the purchased Customer Obligation, which Reserve Fund shall be used to pay any defaults, unpaid balances, losses, costs or expenses, including reasonable attorney fees, of any kind on any Customer Obligation, or any and all sums due for any reason from Dealer to EAC.  The retained reserve amount is subject to change in EAC's sole discretion.  Should more than one Reserve Fund be established by EAC for Dealer, all such Reserve Funds, whenever established, will be cross collateralized.  In other words, all reserve funds generated by the purchase of any Customer Obligations by EAC from Dealer may in EAC's sole discretion be pooled and such pool of reserve funds may be accessed by EAC pursuant to this Section 2(a).

(b)   In the event a Reserve Fund is insufficient to fully reimburse EAC any such amount referred to paragraph 2(a) herein, such deficiency shall be considered a loan to Dealer.  Any such loan shall be repaid within thirty (30) days after request by EAC and shall bear interest at an annual percentage rate of 18 percent, from the date EAC requests payment of such deficiency until it is paid in full.

(c)   In the event EAC is fully reimbursed on any Customer Obligation by payments from Dealer's Reserve Fund, EAC shall reassign, to the extent EAC still has any rights or interest in the Customer Obligation in question, such Customer Obligation to Dealer upon written demand from Dealer.

(d)   The Reserve Fund shall be retained by EAC, without any interest accruing to the benefit of Dealer unless agreed in writing otherwise, until such time as EAC, in its sole discretion, determines the Reserve Fund should be discontinued, or, EAC has received payment in full and been fully reimbursed for all Customer Obligations and all charges related thereto.  Periodic adjustments, however, may be made to the Reserve Fund in EAC's sole discretion.

Section 3.  Warranties and Representations.

Dealer hereby represents and warrants the following:

(a)   All documents evidencing Customer Obligations assigned to EAC are genuine and the only instruments executed for the purchased goods, and each such document has not been altered or modified subsequent to its execution, except for such alterations or modifications as have been acknowledged and initialed by the customer and Dealer.

(b)   Each Customer Obligation is legal, valid and enforceable in all respects and shall remain free from defenses except as otherwise provided by law.

2

MASTER DEALER AGREEMENT
Page 3 of 9

(c)     The contents of any forms used by Dealer, and not supplied by EAC, are legally sufficient, binding and enforceable obligations.  Any such forms used by Dealer contain such disclosures and notices, as are required by applicable laws and regulations.

(d)     Dealer has not engaged in any unfair credit or trade practice or charged any usurious interest rate, finance charge or time price differential, as the case may be, in violation of any applicable laws or regulations, or, violated any applicable law or regulation.

(e)     All statements contained in each Customer Obligation and related documentation are true to the best of Dealer's knowledge after due inquiry.

(f)     The purchase price of the purchased goods stated on each Customer Obligation represents the fair market value of such purchased goods.

(g)     The unpaid principal balance shown on each Customer Obligation is correct.

(h)     The purchased goods have been delivered and accepted, and Dealer has complied with all its obligations with respect thereto.

(i)     Dealer will not, without the prior written consent of EAC, accept collection or payments on Customer Obligations assigned to EAC, repossess or consent to the return of any purchased goods, or modify the terms of any Customer Obligation.

(j)     The customer, and any co-buyer and/or guarantor, each has legal capacity to contract, and the Customer Obligation is legal, valid and enforceable against the customer, and any co-buyer and/or guarantor.

(k)     All signatures appearing on the Customer Obligations are those of the persons with legal capacity to contract and are genuine and authorized, and have not been secured by any coercion, misrepresentation, fraud, deceit or other wrongdoing on the part of Dealer.

(l)     The amount and manner of payment of a down payment, if any, made by the customer is accurately disclosed on the Customer Obligation and all related documentation, and said down payment has been received by Dealer in cash or cash equivalent and has not been separately financed by Dealer.

(m)     The purchased goods have not been rebuilt nor "marked" or "branded" in any manner inconsistent with original goods.

(n)     The buyer or obligor identified on the Customer Obligation is not acting on behalf of or for the benefit of another when purchasing the property.

(o)     All disclosures required by law to be made to customer, or any co-buyer and/or guarantor, prior to signing the Customer Obligation were properly made.

3

MASTER DEALER AGREEMENT
Page 4 of 9

(p)     Title to the purchased goods at the time of sale was properly vested in Dealer free of any liens and encumbrances.

(q)     The cash price of the purchased goods as shown in the Customer Obligation is the "cash price" as defined by the federal Truth In Lending Act, and applicable state laws. The price of the purchased goods is the price charged by Dealer for substantially similar purchased goods in cash transactions, and was not increased because the purchased goods were sold in a credit transaction.

(r)     The purchase price of any accessories, service contracts, warranties or similar products or services is the fair market retail value of such products or services, has not been overstated or inflated in any way, and represents the price for such products or services imposed by Dealer in cash sales of such products or services.

(s)     Dealer has not increased the purchase price of any purchased goods or services, or the cost of financing, because the Customer Obligation involves a member of a protected class as defined by federal and/or state law.

(t)     Dealer holds all necessary licenses to sell the purchased goods or services or to execute Customer Obligations, all of which are valid and in good standing, are not suspended or subject to any claim of violation or proceeding to terminate such licenses.

(u)     Dealer has not made any side agreements with the customer with regard to the Customer Obligation.

(v)     The customer has not, prior to assignment, defaulted in the performance of the Customer Obligation and has not alleged any failure in the performance of, or breach of warranty with respect to the purchased goods.

(w)     All purchased goods sold pursuant to a Customer Obligation are merchantable, fit for their ordinary purpose and intended use, and will not support a sufficient defense to payment.

The foregoing warranties and representations are in addition to those contained in any assigned Customer Obligation.

Section 4.  Repurchase of Customer Obligations.

(a)     Dealer will repurchase any Customer Obligation assigned to EAC pursuant to this Agreement as to which any one or more of the following circumstances exist:

    1)     Any representation or warranty made by Dealer, including but not limited to those in Section 3 of this Agreement, has in any material respect proven to be untrue in the reasonable belief of EAC; or

4

MASTER DEALER AGREEMENT
Page 5 of 9

2)   A customer or any person on a Customer Obligation asserts a valid claim or defense against EAC, which such person could assert against Dealer as the seller of the goods and/or services which are the subject of the Customer Obligation; or

3)   Dealer takes or fails to take any action of any kind which affects the validity or enforceability of the Customer Obligation in the reasonable belief of EAC; or

4)   As to any Customer Obligation which Dealer has endorsed and assigned to EAC with full recourse, in the event there is a default of any kind on such Customer Obligation.

(b)   In any case of repurchase under this Section, Dealer will pay to EAC an amount equal to (1) if the finance charge on the Customer Obligation was determined on a simple interest basis, the original purchase price paid by EAC, plus uncollected interest accrued on the Customer Obligation, plus any expenses of collection incurred by EAC by the Dealer, including attorneys' fees, less all principal sums received by EAC on such Customer Obligation, or, (2) if the finance charge under the Customer Obligation was determined on a pre-computed basis, the unpaid balance of the Customer Obligation, plus any expenses of collection incurred by EAC after default by Dealer, including attorneys' fees, less the unearned portion of the original finance charge included in the Customer Obligation (computed as if the Customer Obligation had been prepaid in full).

(c)   Such payment shall be made by Dealer within ten (10) days after the request for repurchase and shall bear interest at an annual percentage rate of 18 percent from the date EAC requests repurchase until paid in full.

(d)   All Customer Obligations repurchased by Dealer hereunder shall be reassigned to Dealer, without recourse to EAC, and without warranties, express or implied, and shall be delivered to Dealer after payment to EAC. Dealer's obligation to repurchase a Customer Obligation shall not be affected by any change in the terms of payment under the Customer Obligation or by the release or non-perfection of any security interest. EAC shall not be bound to exhaust its recourse against any security before being entitled to payment by Dealer. Dealer waives all notice which Dealer may be entitled to receive, and waives all set-offs and counterclaims.

(e)   Dealer's failure to respond to EAC's demand for repurchase of a Customer Obligation within ten (10) days of EAC's written demand for repurchase thereof shall raise a rebuttable presumption that such repurchase is required pursuant hereto.

Section 5. Indemnity.

(a)   In the event any claim or defense is raised against EAC or Dealer in connection with any Customer Obligation, which Dealer can be required by EAC to repurchase under Section 4 of this Agreement, Dealer shall indemnify, save harmless and defend EAC in any action or actions, whether at law or in equity, in which EAC is made a party, against all costs, expenses and attorneys' fees incurred by EAC in any such action, as

5

MASTER DEALER AGREEMENT
Page 6 of 9

well as against any set off, recoupment or judgment awarded, taken or allowed against EAC in any such action. If EAC shall deem it necessary, EAC shall have the right in its sole discretion to select its own counsel and conduct and supervise its own involvement in such action, and said rights shall not prejudice EAC's rights under this Section 5.

(b)     EAC shall not compromise and settle any such action without the prior written consent of Dealer; provided, however, Dealer's consent thereto shall not be unreasonably withheld. Dealer shall indemnify EAC for its reasonable costs, expenses and attorneys' fees so incurred, as well as for any loss to EAC due to such compromise or settlement.

(c)     All reasonable costs, expenses and attorneys' fees, as well as the amount of any judgment, set off or recoupment so incurred shall be paid to EAC within thirty (30) days after request by EAC, and shall bear interest at an annual rate equal to the lesser of 1% in excess of the Prime Rate of Interest and the maximum rate allowed by law from the date of EAC's request until it is paid in full.

Section 6. Notices.

Any notice, demand, communication or writing required or permitted by this Agreement shall be in writing and shall be effective upon its deposit into the regular United States mail, at any United States Post Office, or Branch thereof, postage prepaid, and addressed to the parties as follows:

| | |
|---|---|
| EAC: | Equitable Acceptance Corporation<br>Attn: Jeff Henn<br>8421 Wayzata Boulevard, Suite 300<br>Golden Valley, MN 55426 |
| DEALER: | Chefmaster<br>26662 Cooperway<br>Wellington, FL 33414 |

Section 7. Waiver – Remedies Cumulative

No delay on the part of a party hereto in the exercise of any right or remedy shall operate as a waiver thereof by such party, and no single or partial exercise by such party of any right or remedy shall preclude other and further exercise thereof or the exercise of any other right or remedy, all remedies hereunder and otherwise provided by law being cumulative. Dealer's obligations hereunder shall not be affected by any extension, renewal, modification or other change in the manner, place or terms of payment of any Customer Obligation, or by the release of or settlement with any party liable for payment of any Customer Obligation, and EAC shall not be required to exhaust its rights and remedies under the Customer Obligation or against other persons or collateral before being entitled to payment in accordance with this Agreement.

MASTER DEALER AGREEMENT
Page 7 of 9

Section 8. Termination.

This Agreement may be terminated by either party hereto at any time with or without fault or default by written notice given as provided herein; provided, however, that such termination shall in no way affect, and that this Agreement shall remain fully operative as to, any transactions entered into or rights granted or obligations incurred prior to such notice.

Section 9. Books and Records.

Dealer agrees that EAC may inspect Dealer's records as they pertain to this Agreement. Such inspections may be made as frequently as EAC deems necessary. Dealer also agrees to provide periodically EAC with signed financial statements of Dealer. Dealer agrees that such financial statements will be true and correct in all respects. EAC will hold all such information for its internal use and will treat all financial information supplied by Dealer with the same level of confidentiality as it applies to its own confidential information.

Section 10. Dealer Not Agent of EAC.

This Agreement does not make Dealer an agent or representative of EAC for any purpose or reason, and Dealer agrees not to represent to any person or entity that it is an agent or representative of EAC. Dealer is not granted any express or implied right to bind EAC in any manner whatsoever.

Section 11. Miscellaneous.

(a)     This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which counterparts of this Agreement taken together shall constitute but one and the same instrument.

(b)     Section headings used in this Agreement are for convenience only and shall not affect the construction of this Agreement.

(c)     This Agreement shall be construed in accordance with the laws of the State of Minnesota.

(d)     Wherever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

(e)     This Agreement shall be binding upon and inure to the benefit of Dealer and EAC, and their respective successors, heirs and assigns, except Dealer shall not have the

MASTER DEALER AGREEMENT
Page 8 of 9

right to assign its rights hereunder or any interest herein without the prior written consent of EAC.

(f)     EAC shall receive from Dealer all reasonable costs, expenses and attorneys' fees incurred by EAC in enforcing the terms of this Agreement.

(g)     This Agreement may be amended only in a writing signed by both parties hereto.

(h)     EACH PARTY WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS (i) UNDER THIS AGREEMENT OR ANY RELATED AGREEMENT OR UNDER ANY AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT DELIVERED OR WHICH MAY IN THE FUTURE BE DELIVERED IN CONNECTION HEREWITH, OR (ii) ARISING FROM ANY RELATIONSHIP EXISTING IN CONNECTION WITH THIS AGREEMENT, AND AGREES THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.

(i)     Dealer waives notice of acceptance of this Agreement, and, as to each Customer Obligation purchased hereunder, waives presentment or other demand for payment, notice of dishonor or other notice of non-payment, protest and any and all other notices to which Dealer might otherwise be entitled.

(j)     Any reserve fund account of Dealer shall be under the exclusive control of EAC, and Dealer acknowledges that any such account stands as security for payment of Customer Obligations and Dealer's obligations hereunder, and Dealer has no right to such account except as expressly provided in this Agreement.

(k)     If any payments are made to Dealer with respect to any Customer Obligation after purchase of such Customer Obligation by EAC, Dealer will receive and hold such payments in trust for EAC without commingling them with the funds of Dealer and will promptly deliver such payments to EAC.  Dealer also hereby irrevocably appoints EAC as Dealer's attorney-in-fact, with full power of substitution and revocation, to endorse Dealer's name to any check or other remittance offered as payment on a Customer Obligation purchased by EAC, and to make insurance claims on property injured in a casualty loss.  If any property described in a Customer Obligation purchased by EAC shall come into Dealer's possession by virtue of repossession, voluntary surrender or otherwise, Dealer shall promptly notify EAC and deliver such property to EAC on demand, or otherwise hold and protect such property at no expense to EAC, if EAC so requests, for a period of not more than ninety (90) days.

8

MASTER DEALER AGREEMENT
Page 9 of 9

IN WITNESS HEREOF, this Agreement has been duly executed as of the day and year above first written.

State of Nevada
County of Washoe
Subscribed and sworn to before me
This 17th day of august, 20 11

Notary Public

My commission expires _____

March 15, 2015

DEALER
By: Arnold Johnson
Its: _____

EQUITABLE ACCEPTANCE CORPORATION
By: _____
Its: _____

NOTARY PUBLIC
STATE OF NEVADA
County of Washoe
JORDAN LOVE
No: 11-4824-2
My Appointment Expires March 15, 2015

9

The image is a handwritten mark "IB" at top left.



## PERSONAL GUARANTY

For good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, and to induce Equitable Acceptance Corporation, 8421 Wayzata Boulevard, Suite 300, Golden Valley, MN 55426, and its successors, assigns, and representatives, ("EAC") to enter into a Master Dealer Agreement with _Arnold Johnson_ ("Dealer"), dated _____ ("MDA"), the undersigned hereby absolutely and unconditionally guarantees to EAC the full and prompt performance and compliance, including but not limited to payment, with all liabilities and obligations of Dealer as described in the MDA.

The undersigned further acknowledges and agrees:

1. EAC may, at any time and from time to time, without notice to or consent of the undersigned, extend, alter or modify Dealer's obligations under the MDA or any Customer Obligation as defined in the MDA, without in any way impairing or affecting this Personal Guaranty.

2. The undersigned waives all notices, demands and protests, and all other formalities of every kind in connection with the enforcement of the obligations hereunder, the omission of or delay in which might constitute grounds for relieving the undersigned of the obligations hereunder. No failure on the part of EAC to exercise, and no delay in exercising any right, power or remedy hereunder shall operate as a waiver hereof of any right, power or remedy hereunder.

3. EAC may take, or not take, in its sole and absolute discretion, action against Dealer, without in any way impairing or affecting this Personal Guaranty. EAC is under no obligation to take any action against Dealer or any other person or entity as a condition precedent to the undersigned being obligated to perform as agreed herein.

4. This is a continuing guaranty of performance and compliance, including but not limited to payment, and shall remain in full force and effect and be binding upon the undersigned and its successors and assigns and shall inure to the benefit of EAC, its endorsees, successors, representatives and assigns. The undersigned may not, without the written consent of EAC, revoke this Personal Guaranty.

5. This document represents the entire agreement between EAC and the undersigned with respect to the matters referred to herein and no waiver or modification hereof shall be effective unless in writing and signed by EAC and the undersigned.

6. The undersigned irrevocably submits to the jurisdiction of any Minnesota or Federal court sitting in Minnesota over any suit, action or proceeding arising out of or relating to this Personal Guaranty and agrees that EAC shall have the option, in its sole discretion, to lay the venue of any such suit, action or proceeding in the courts of the state of Minnesota or those of the United States of America sitting within Minnesota, and waive any objection to such venue. The undersigned further agrees to pay all costs incurred by EAC in enforcing this Personal Guaranty, including, without limitation, court costs and reasonable attorneys' fees, whether incurred in a formal proceeding or otherwise.

7. This Personal Guaranty shall be governed by and construed and interpreted in accordance with the laws of the State of Minnesota applicable to contracts made in and performed in the State of Minnesota.

Dated: _8/17/11_

_Arnold Johnson_
Undersigned

_Arnold Johnson_
Name printed

STATE OF _Nevada_ )
                              ) ss.
COUNTY OF _Washoe_ )

The foregoing Personal Guaranty was acknowledged before me this _17_ day of _August_, 2011, by _Arnold Johnson_.

_____
NOTARY PUBLIC

NOTARY PUBLIC
STATE OF NEVADA
County of Washoe
JORDAN LOVE
No. 11-4824-2
My Appointment Expires March 15, 2015

Nutrichef USA, LLC
11145 Outlet Drive
Knoxville, TN 37932

September 2, 2014

To Equitable/ New Era
   Attn: Jeff Henn

I Casey McClure am turning over Nutrichef USA and all accounts, monies owed, payments due, accounts, reserves, and customers to Arnold (AJ) Johnson effective immediately.  He will take over full and sole responsibility for everything NutriChef USA. It has been a pleasure doing business with you and I believe that turning everything over to AJ Johnson is the best for all involved.

Sincerely

Casey McClure